INDEPENDENT CELLULAR TELEPHONE, INC., a Delaware corporation, Plaintiff,

v.

DANIELS & ASSOCIATES, a partnership, David Rhodes, Defendants.

DANIELS & ASSOCIATES, a partnership, Counterclaimant,

v.

INDEPENDENT CELLULAR TELEPHONE, INC., a Delaware corporation, Counterdefendant.

TEMPLETON, INC., a Delaware corporation, Plaintiff,

v.

DANIELS & ASSOCIATES, a partnership, Defendant.

SALINE CELLULAR, INC. a Delaware corporation, Plaintiff,

v.

DANIELS & ASSOCIATES, a partnership, Defendant.

Nos. C–93–0983 DLJ, C–94–0779 DLJ and C–94–0786 DLJ.

United States District Court, N.D. California.

Aug. 30, 1994.

Daniel Furniss and Theodore Herhold, with the law firm Townsend and Townsend, Khourie and Crew, San Francisco, CA, for ICT, Templeton, Inc., and Saline Cellular, Inc.

Richard Patch and Susan Jamison, with the law firm Coblentz, Cahen, McCabe & Breyer, San Francisco, CA, for Daniel & Associates.

## ORDER

JENSEN, District Judge.

The Court heard argument on June 29, 1994 in the above-captioned matter. Daniels & Associates ("D & A") moved to dismiss the related actions brought by Templeton, Inc. and Saline Cellular, Inc. Cross-motions for summary judgment were also presented for consideration by D & A and Independent Cellular Telephone ("ICT"). Richard Patch and Susan Jamison of Coblentz, Cahen, McCabe & Breyer appeared on behalf of D & A; ICT, Templeton, Inc. and Saline Cellular, Inc. were represented by Daniel Furniss and Theodore Herhold of Townsend and Townsend Khourie and Crew. For the reasons stated below, the Court enters the following disposition: the motions to dismiss submitted by D & A are granted; and summary judgment is granted in favor of D & A and against ICT.

## BACKGROUND

I. *Factual Background and Procedural History*

Collectively, these diversity actions seek to establish that contracts entered into with D & A were both illegal and breached, and that D & A engaged in unfair competition within the meaning of California's Business & Professions Code.[1] ICT, Templeton and Saline Cellular each entered into various contracts with defendant D & A, a Colorado general partnership in the business of representing clients in arranging and negotiating the purchase and sale of cellular telephone businesses. Now before the Court is the question of the viability of those contracts.

Case number C–93–0983 DLJ involves plaintiff and counterdefendant ICT, a Delaware corporation which entered into a letter agreement with D & A on October 22, 1991 at a trade show in California. Pursuant that agreement, D & A was to act as the exclusive agent and representative of ICT on a "best efforts" basis to find a purchaser for certain assets of ICT. Those assets specifically included the cellular authorization to serve the Idaho 5, Tennessee 1, and New York 4 Rural Service Areas (RSAs). As compensation, D & A was to receive a commission at the closing of the transaction.

ICT contends that while D & A initially performed "certain limited services under the Agreement, [D & A] made little effort to market the assets." ICT Mot. at 3. The agreement was terminated between the parties and, subsequent to the termination, ICT was successful in selling certain of its assets. D & A thereafter contended it was owed a commission. In a first amended complaint filed July 8, 1993—after adjudication on a motion to dismiss before Judge Vukasin— ICT sought declaratory relief that the contract was both illegal as well as breached, and also that D & A had engaged in unfair competition within the meaning of California's Business and Professions Code. D & A counter-claimed for commissions it claimed to be owed.

---

**1.** C–93–0983–DLJ contains three causes of action:
(1) declaratory relief that the contracts were breached;
(2) declaratory relief that the contracts were illegal; and
(3) unfair competition under Cal.Bus. & Prof. Code § 17200.

C–94–0779–DLJ and C–94–0786–DLJ each contain three causes of action: (1) declaratory relief that the contracts were illegal; (2) unfair competition under Cal.Bus. & Prof.Code § 17200; and (3) rescission.

Templeton, Inc., in case number C–94–0779 DLJ, alleges it entered into a contract on August 31, 1991 with D & A, whereby the latter was to assist in finding a buyer for cellular authorization to serve the Massachusetts 1 RSA. Following completion of a transaction, D & A claimed a commission of $163,186.00, which Templeton paid. Templeton is now suing for rescission of those monies, again seeking declaratory relief on the theories of illegality of contract and unfair competition. D & A has filed a motion to dismiss.

Saline Cellular, Inc., alleges in case number C–94–0786 DLJ, that it entered into a listing agreement with D & A on November 30, 1990 in California, whereby D & A was to act as the exclusive agent and representative in finding a purchaser for the cellular authorization to serve the Nebraska 9 RSA. On September 9, 1991, Saline sold the interest and, pursuant to the agreement, paid D & A a commission of $99,403.00. Saline thereafter filed essentially the same action as filed by Templeton, and D & A has moved to dismiss.

## II. *Legal Standard*

### A. *Cross–Motions for Summary Judgment*

The Federal Rules of Civil Procedure provide for summary adjudication where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Electric Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1983); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986)) (emphasis in original).

■ On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. To succeed on summary judgment, a plaintiff must prove each element essential to the claims upon which he seeks judgment by undisputed facts. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) (party with burden "must establish beyond peradventure *all* of the essential elements ..." (emphasis original)). In an influential article, a plaintiff's burden has been articulated as follows: "Where the moving party has the burden [of proof at trial ...,] his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–488 (1984).

■ By contrast, a defendant's motion for summary judgment faces a lighter burden. Because the defendant does not bear the burden of proof at trial, the defendant need only point to the insufficiency of the plaintiff's evidence to shift the burden to the plaintiff to raise genuine issues of fact as to each claim by substantial evidence. *T.W. Electric,* 809 F.2d at 630 *citing Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Kaiser Cement,* 793 F.2d at 1103–04. Should a plaintiff fail to raise a genuine issue of fact, summary adjudication in favor of the defendant is appropriate.

■ In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party. *T.W. Electric,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). Regardless of who is the

moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 321, 106 S.Ct. at 2552. The standard for judging a motion for summary judgment is the same standard used to judge a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

▮▮▮ In meeting their burdens of proof, each party must come forward with admissible evidence. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir.1985); *Thornhill Pub. Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762–63 (9th Cir.1980). Plaintiffs must ultimately persuade the Court in opposing summary judgment that they will have sufficient admissible evidence to justify going to trial.

B. *Motion to Dismiss*

▮▮▮ Motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are generally viewed with disfavor. The Supreme Court has held that a complaint should not be dismissed unless it appears "beyond doubt" that plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Thus, the question presented by a motion to dismiss is not whether plaintiff will prevail in the action, but whether he is entitled to offer evidence in support of his claim. *Scheuer v. Rhodes*, 416 U.S. 232, 235, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In answering this question, the Court must assume that plaintiff's allegations are true and must draw all reasonable inferences in plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987).

Even if the face of the pleadings indicates that the chance of recovery is remote, the Court must allow plaintiff to develop his case at this stage of the proceedings. *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir.1981).

▮▮▮ If the Court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is only denied if it is clear that amendment would be futile and "that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir.1987) (quoting *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (per curiam)); *see Poling v. Morgan*, 829 F.2d 882, 886 (9th Cir.1987) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)) (futility is basis for denying amendment under Rule 15).

## DISCUSSION

Despite the amount of papers submitted, there is only a limited number of issues involved, and these issues are for the most part applicable to each of the three cases. Most significant is the contention that each plaintiff is entitled to a declaration that their contract with D & A was illegal. The parties agree generally that California law governs the analysis.

I. *Whether the Contracts are Illegal*

California law provides that it is "unlawful for any person to engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this state without first obtaining a real estate license from the department [of real estate]." Cal.Bus. & Prof.Code § 10130. Further, section 10136 prohibits an unlicensed real estate broker from bringing an action for collection or compensation for covered acts, and section 10139 provides that unlicensed activity is punishable by imprisonment and fine. A real estate broker is, in the first place, defined as "a person who, for a compensation or in expectation for a compensation ... (a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or

purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity." Cal.Bus. & Prof.Code § 10131.

D & A is not licensed as a real estate broker pursuant to California's regulatory scheme. Expectedly, however, D & A contends it is not required to be so licensed, offering various explanations why the licensing scheme is inapplicable.

▇▇▇ First, D & A contends it is protected by a "finder's exception" to the licensing statute, whereby one who simply finds or introduces a prospective purchaser to a seller need not be licensed in order to receive a commission for his services. *Preach v. Monter Rainbow,* 12 Cal.App.4th 1441, 16 Cal. Rptr.2d 320 (1993). The exception has been explained as follows:

> A person is not a broker ... where he merely brings a buyer and a seller together so that they may make their own contract without aid from him, but *any participation, however slight, in the negotiations will bring him within the definition.*

*Evans v. Riverside Int'l Raceway,* 237 Cal. App.2d 666, 675–76, 47 Cal.Rptr. 187 (1965) (emphasis added). Phrased differently, any time there occurs something more than "the bare act of introduction," *Crofoot v. Spivak,* 113 Cal.App.2d 146, 147, 248 P.2d 45 (1952), the exception is inapplicable.

The facts at hand illustrate an involvement far surpassing that necessary to be protected by the exception. Rhodes himself acknowledged in a deposition that "negotiations" would be referred to D & A, and that D & A could "maximize the value" of the sales it sought to promote. ICT's Mot. at 12. D & A also prepared an information package for prospective purchasers, was obligated to assist in negotiations if requested by ICT, forwarded information to potential buyers, and placed calls to several potential customers in California and elsewhere. ICT's Mot. at 12; Reply at 2. Accordingly, the finder's exception is inapplicable.

▇▇ Another argument forwarded by D & A successfully removes it from coverage of the licensing scheme. D & A argues that it comes within an exception to the licensing requirement whereby sales of "radio ... enterprises which are licensed by the Federal Communications Commission [hereinafter "FCC"] are exempted from compliance with state licensing provisions. *See* Cal.Bus. & Prof.Code § 10133.3. Although D & A urged the availability of this exception before Judge Vukasin in moving for dismissal, the Court then rejected the argument. *See* Order, June 18, 1993. D & A now seeks reconsideration, which the Court finds merited.

▇▇ The overall purpose of the exception enacted by the state legislature in September of 1990 was to exempt certain business opportunities from duplicative or redundant state regulation, when such business opportunities were already being regulated by the federal government. That purpose was enshrined in the express language of the exemption, which excludes from regulation those "radio ... enterprises licensed or regulated by the [FCC]."

▇▇ Where a statute is clear, the "plain meaning" rule applies, and the legislature is presumed to have meant what it said. *Sutco Construction Co. v. Modesto High School Dist.,* 208 Cal.App.3d 1220, 1228, 256 Cal.Rptr. 671 (1989). Applying this rule of construction, the primary inquiry for the Court is to determine whether there is any ambiguity or contradiction on the face of the statute and, if not, to ascertain the statute's plain meaning. Because there is no such ambiguity or contradiction in the statute at hand, the applicable question is whether the cellular phone industry is indeed a "radio ... enterprise[ ] licensed or regulated by the [FCC]", under the plain meaning of that phrase.

The cellular phone industry is defined by the FCC as a "radio service." 47 C.F.R. § 22.2 at p. 94.[2] Furthermore, the industry

---

**2.** Plaintiffs argue the unavailability of the exemption on grounds that the Code of Federal Regulations deals in separate sections with regulations pertaining to radio stations and cellular phone services. *See* ICT's Opp'n to Mot. to Dismiss at 11–12. Plaintiffs therefore argue, "Thus, contrary to defendants' misleading argument, the FCC in referring to cellular telephone services uses the term 'cellular systems' not 'radio.' " *Id.* at 12.

is licensed and regulated by the FCC—both in the provision of cellular phone service as well as in any appurtenant transfers of ownership interests. *See, e.g.,* 47 C.F.R. §§ 22.901, 22.916–22.940. Accordingly, under the plain meaning of the statute, the cellular phone industry is exempted from regulation by the state.

■ Ordinarily, the analysis would end at this point, as interpretation of a clear statute renders inquiry into legislative history and other matters unnecessary. However, because prior consideration of this very issue resulted in a contrary disposition by Judge Vukasin, further discussion is appropriate.

In finding that California's legislature did not intend to include cellular telephone businesses among the radio enterprises exempted from real estate licensing requirements, Judge Vukasin wrote:

> It is clear from the legislative history that the purpose of § 10133.3 is to provide an extremely limited exemption to media brokers who specialize in the sale of commercial radio businesses, not cellular telephones. The bill was sponsored by the National Association of Media Brokers and was intended to affect fewer than 100 transactions per year in California. Senate Comm. on Bus. and Prof., Report on Aug. 6, 1990 Hearing on AB 3071. The author of the bill, in a letter to the Governor, explained that California has fewer than 800 *commercial radio stations* to which the exemption would apply. Letter from John Lewis, Assemblyman, 67th Dist. of Cal., to George Deukmejian, Governor of California (Aug. 28, 1990).

Order at 4 (emphasis in original). The Order concluded that the interpretation of "radio enterprise" urged by D & A suffered from "technical specificity," would be inconsistent with the legislature's purpose and intent, and "would result in absurdity rather than wise policy." *Id.* at 5–6.

That the codification of the regulations pertaining to radio stations and cellular phones occurs at different locations proves little. Rather, the operative inquiry is whether cellular phones are properly depicted as any "radio ... enterprises licensed or regulated by the [FCC]." To this inquiry, plaintiffs essentially concede, as they

■ The analysis undertaken by Judge Vukasin overlays a consideration of clear statutory language with an emphasis on perceived policy implications. As discussed, however, it is not the province of the Court to piece together a "wise policy" in interpreting a statute; rather, the court must give effect to the legislature's directive as it has been expressed in the employed statutory language. This court is persuaded that Judge Vukasin's Order displaces that language with an incomplete policy mosaic, comprised of inevitably inconclusive legislative history. Although the referenced assemblyman might earnestly have expressed his belief in writing to the governor that the bill would affect a maximum "800 commercial radio stations", such a restriction does not appear in the statute, which references not radio "stations" but radio "enterprises." It is well within reason that, while Assemblyman Lewis understood the bill to apply exclusively to those radio enterprises which were "commercial radio stations," others supporting passage of the bill reasonably anticipated that the bill would extend to its natural reach—indeed, to any "radio ... enterprises licensed or regulated by the [FCC]."

Though Judge Vukasin may have assessed such an interpretation as unwise, it strikes this court as eminently within reason, that members of the California legislature might extend the enactment to foreclose all duplicative regulation of any "radio, television, or cable enterprises licensed or regulated by the [FCC]." To borrow the reasoning of the very assemblyman who anticipated the legislation would have a more limited effect, further state regulation of the cellular phone industry might well "serve no practical purpose." *See* Stmt. of Assemblyman Lewis at Request for Jud'l Notice, Exh. B.

Each of the various arguments advanced by plaintiffs fails to support Judge Vukasin's ruling. First, plaintiffs contend "the word 'radio' does not ordinarily call to mind 'cellu-

must, that title 47 C.F.R. § 22.2 does classify cellular telephone service as a "radio service." *See* Opp'n to Mot. to Dismiss at 11 ("At best, the cited definition simply refers to cellular telephone service as a *kind* of public mobile radio service among several possible kinds ...") (emphasis in original).

lar telephone,' and the ordinary reader would not think of 'cellular telephone' upon encountering the word 'radio' in the statute." ICT's Opp'n to Mot. to Dismiss at 9. This contention, while arguably true, misunderstands the actual inquiry before the Court. As D & A correctly responds, the operative inquiry focuses upon those "radio ... enterprises *which are licensed or regulated by the [FCC]*." Reply at 7 (emphasis in original). Thus, it is irrelevant whether the cellular telephone industry "is commonly seen" as a "radio enterprise." *See* ICT's Opp'n to Mot. to Dismiss at 9. What is instead determinative is whether a "radio ... enterprise[ ] *licensed or regulated by the [FCC]*" would be plainly understood to include the cellular telephone industry. As discussed above, it is readily apparent to the Court that it would be so understood.

Plaintiffs next note that the legislature could have specifically exempted the "cellular telephone industry," from the real estate licensing requirements, but chose not to. *See* ICT's Opp'n to Mot. to Dismiss at 9–10. According to plaintiffs, this fact underscores an intent on the part of the legislature not to exempt the cellular telephone industry. *See id.* This argument sweeps too broadly; even had the legislature additionally specified the "cellular telephone industry" for exemption, such specification would merely be surplusage in an otherwise plain legislative enactment, since simultaneous use of a broader definition of "radio enterprises" would, for the reasons already discussed, already accomplish the exemption.

Plaintiffs next argue against the applicability of the exemption by contending that D & A's expansive interpretation of the term "radio ... enterprise[ ]" would yield untoward results. Specifically, plaintiffs contend that if defendants' sweeping construction of 'radio ... enterprises ... licensed and regulated by the Federal Communications Commission' is adopted, then the licensing exemption of § 10133.3 expands to include (at least) every brokered transaction of a business opportunity that relates to radio-frequency technology, so long as the transaction is not in substance a transfer of real property. This might include, for example,

a brokered sale of a Radio Shack or a Genie garage-door opener business....

ICT's Opp'n to Mot. to Dismiss at 14. This argument misapprehends the fact that the exemption applies only to those radio enterprises licensed or registered by the FCC. Therefore, even assuming that garage-door businesses might be properly classified as "radio enterprises," they would not be included within the exemption because they are not licensed or regulated by the FCC. *See* Reply at 8 n. 3.

Had the legislature indeed sought to circumscribe the exemption only to radio stations, it readily could have done so. And, should the legislature subsequently decide that the exemption it carved has cut too freely, a remedy lies well within its grasp in the form of corrective legislation. Given the plain language of the legislation, the fact that a natural reading of these words leads to a sensible interpretation, and that the conclusion now reached by the Court appears from the legislation to be well within the scope of consideration of the legislature, the Court finds the cellular phone industry exempted from coverage of California's real estate licensing scheme.

 Plaintiffs next argue that, even if applicable, the exemption would cover only part of the contracts at issue, with the effect that certain remaining parts of the challenged contract would continue to be subjected to the licensing scheme. *See* ICT's Opp'n to Mot. to Dismiss at 16–18. For instance, plaintiffs argue that the ICT stock whose sale was contemplated by the agreement would not be subject to regulation by the FCC, so that the exemption would not cover this aspect of the agreement. *See id.* at 17. Plaintiffs further argue that ICT's minority interests in various companies would similarly not be covered by the FCC regulation. *Id.*

 These arguments are unavailing. While contending throughout their papers that those activities engaged in by D & A were all covered by the regulatory scheme, ICT then, in the specter of a finding of the exemption's applicability, suggests that some of those activities may not be covered.

Plaintiffs have cited no authority for such a limited reading of those "business opportunities" otherwise subject to regulation under the regulatory scheme. Rather, as acknowledged elsewhere in ICT's papers, California has a strict regulatory scheme triggered by even de minimus brokerage services. *See Consul Ltd. v. Solide Enterprises, Inc.*, 802 F.2d 1143, 1151 n. 7–8 (9th Cir.1986). In the absence of any authority to the contrary, the Court can only assume that the scope of the exemption is as broad as the scope of coverage in the first instance.

D & A's request for reconsideration of Judge Vukasin's Order is therefore granted. Having found the licensing scheme generally inapplicable to the present facts, all arguments premised on the supposed illegality of the contract are without effect.[3]

## II. *Whether Plaintiffs' Claim For Injunctive Relief Under § 17200 is Properly Before the Court*

D & A and Rhodes have also moved for summary judgment on those claims seeking injunctive relief under California's Business and Professions Code sections 17200 and following, which have been interpreted to permit any person to bring suit for injunctive relief as a private attorney general. *See Committee on Children's Television, Inc. v. General Foods Corporation*, 35 Cal.3d 197, 210–211, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). Predicate to a violation of those sections is a finding that a defendant "engages, has engaged, or proposes to engage in unfair competition." Bus. & Prof.Code § 17203. Because plaintiffs have linked this claim entirely to their contention that defendants have engaged in brokerage services prohibited by California law, *see* ICT's Opp'n to D & A's Mot. for Sum.J. at 18–20; Saline Cellular's Opp'n to D & A's Mot. to Dismiss at 12–14; Templeton's Opp'n to D & A's Mot. to Dismiss at 12–14; Complaint at ¶¶ 20–21, and because the Court has found that defendants were not subject to the licensing requirements at California law, the claims for relief

under California's Business and Professions Code fail *a fortiori*.

## III. *Whether D & A is Entitled to Summary Judgment on its Counter–Claim for Owed Commissions*

■ The parties have also filed cross-motions for summary judgment on D & A's claim that it is owed commissions from ICT. Specifically, D & A claims an entitlement to $13,700 from the sale of the New York 4 RSA, and $489,662.85 from the sale of the Idaho 5 and Tennessee 1 RSAs. *See* D & A's Mot. at 31–36.

Initially, D & A has proved it used its "best efforts" to procure a sale. D & A contends it utilized its best efforts in attempting to procure a buyer for the Idaho 5 and Tennessee 1 RSAs, by: identifying and soliciting approximately 30 prospective purchasers, including the ultimate purchaser of the New York 4, Idaho 5, and Tennessee 1 RSAs; preparing an information package describing ICT and each of the RSAs which ICT wished to sell, and thereafter forwarding such packages to potential purchasers; and being ready to assist ICT in negotiations over the terms of any transaction, in the event such assistance was needed. *See* Reply at 33.

The entirety of ICT's attempt to demonstrate a genuine issue of material fact precluding summary judgment is contained in a conclusory assertion that D & A did not use its best efforts, with an accompanying citation to the declaration of Quentin Breen, an officer of ICT. *See* ICT's Opp'n at 20. Breen's declaration testimony states that D & A "made some pro forma efforts to market ICT's assets but thereafter, as far as I could observe, did little if anything further. [D & A] did not introduce ICT to any prospective purchasers, never arranged any meetings with interested parties, never presented any offers to buy, even at a low price." Quentin Decl. at ¶ 5. Breen's dissatisfaction, accord-

---

**3.** Given this holding, the Court finds it unnecessary to address various other arguments presented by D & A—that D & A's out of state activities do not render it subject to the licensing scheme, and that the securities-dealer exception applies,

under which licensed security broker-dealers are exempted from the requirement that "business opportunity" brokers be licensed as real estate agents in California.

ing to his declaration, led to the termination of the agreement by ICT. *See id.*

This depiction of D & A's services is insufficient to create a disputed fact precluding summary judgment, since Breen's declaration is fundamentally inconsistent with his own deposition testimony taken some four months prior. During the deposition, Breen admitted: he did not know whether or not Rhodes began to solicit interest in ICT following the signing of the agreement between ICT and D & A, *see* Breen Depo. at 59:4–10; that aside from not receiving information from D & A, Breen had no information as to what D & A did, or "who" or "how" D & A contacted prospective clients, *see id.* at 59:11–16; and, that as far as he knew, D & A might "have contacted everybody in the industry or none at all." *Id.* at 59:17–21; *see* D & A's Reply at 13–14. Given these contradictions between his declaration and deposition statements, Breen's testimony cannot be the basis for creating an issue of material fact capable of overcoming summary judgment. *See Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975) (party cannot create issue of fact by presenting declaration contradicting sworn deposition testimony). Furthermore, as D & A argues, none of ICT's other principals testified in deposition that he knew of facts contradicting D & A's claims regarding its performance. *See* Reply at 12–13 (citing Elowson Depo. at 61–63, 68–69, 109–110, 125; Easton Depo. at 131–132, 136; Parks Depo. at 109–110). There is, accordingly, nothing on the evidentiary record sufficient to present a triable issue of fact on whether D & A met any obligation to utilize its best efforts.

It is also readily apparent that D & A fulfilled those express terms of the contract pertaining to completion of the transaction. As to the New York 4 RSA sale, the transaction closed during in April of 1992, within the term of the agreement entered between D & A and ICT. *See* D & A's Mot. at 31. Because the contract calls for payment of a commission on any transaction "consummated during the term", D & A is entitled to the agreed compensation. ICT has not disputed in its opposition papers either D & A's characterization of the events surrounding the New York 4 RSA contract, or the amounts alleged to be owed as commission thereunder. *See* D & A's Reply at 14 n. 9. Accordingly, summary judgment is appropriately granted in favor of D & A on its counterclaim for $13,700 as a commission owed pursuant to the New York 4 RSA transaction.

■ As to the sale of the Idaho 5 and Tennessee 1 RSAs, D & A contends it is owed a commission pursuant to that term of the agreement providing for compensation for any transaction "(iii) agreed upon during the one-year period following the Term if, during the Term, (a) negotiations leading to such a transaction commenced or (b) a party with whom such transaction ... consummated was referred or identified to [ICT] by [D & A] as a prospective purchaser or (c) such transaction commenced, was arranged for or procured directly by [ICT]...." D & A's Mot. at 34–35; ICT's Mot. at 20.

D & A correctly contends the threshold condition is met, since the transaction was agreed upon during the one year period following the term. *See* D & A's Mot. at 35. Pursuant to its terms, the agreement was to run for 120 days following the date it was entered and for successive 60 day periods thereafter, unless cancelled by written notice of either party. *Id.* at 2 n. 2. ICT sent a written termination notice, dated July 8, 1992, at the beginning of the third 60 day period, thereby terminating the agreement on August 17, 1992. *Id.;* ICT's Opp'n at 21. Accordingly, the "one year period following the term" ended August 17, 1993. ICT's Opp'n at 21. Because the parties acknowledge that an agreement in principle was made between ICT and Telephone and Data Systems, Inc. ("TDS"), the buyer, in late August of 1992, *see* D & A's Mot. at 35; ICT's Opp'n at 21, the condition that the sales transaction be agreed upon during the one year period following the term is clearly satisfied.

D & A then must prove that any one of the remaining three, alternate conditions is met, *i.e.* that during the term: negotiations leading to the transaction commenced; a party with whom the transaction was consummated was referred or identified to ICT by D & A as a prospective purchaser; or, that the

transaction was arranged for or procured directly by ICT. D & A's Mot. at 34–35. It is abundantly clear that the first of these three conditions is satisfied, rendering consideration of the remaining two unnecessary.

ICT disputes that this condition was met, contending "the term had already expired by the time 'negotiations leading to such a transaction commenced' ..." ICT's Opp'n at 21. The only support put forth for ICT's assertion—a citation to the deposition testimony of LeRoy Carlson, Chairman of TDS, who participated in the sale of the Idaho 5 and Tennessee 1 RSAs—is insufficient to create a triable issue of fact. According to Carlson, "Although [TDS] had one or two conversations in June and July, and possibly in May, there were no serious discussions or negotiations until ... August 27, 1992." Carlson Depo. at 21:4–7. Initially, it is worth noting that Carlson is in no position to deny that any "serious discussions or negotiations" occurred, as he testified in declaration testimony that he was unable to either confirm or deny the existence of discussions between other TDS representatives and ICT's principals or David Rhodes during the term of the agreement. *See* Carlson Depo. at 4:22–5:6, 9:10–19, 10:3–15; 11:15–12:4; Reply at 18. Moreover, notwithstanding Carlson's denial of "serious" contacts occurring during the term of the agreement, written notes TDS produced pursuant to subpoena reveal the existence of substantive negotiations concerning the Idaho 5 and Tennessee 1 transactions during the term of the agreement. *See* D & A's Mot. at 35; Reply at 15–20. For instance, TDS's notes of April 27, 1992 reflect discussions of price; whether ICT had "clean title"; and whether ICT would indemnify TDS for [D & A's] brokerage commission. *See* Reply at 15–16. Notes from a May 11, 1992 meeting reveal further discussions as to price. *See id.* at 16. Finally, notes from a June 15, 1992 contain discussion of a possible "tax-free" exchange as a means of accomplishing the transaction. All these negotiations occurred during the term, notwithstanding that the agreement itself was culminated on a date outside the term. Accordingly, the conditions that, "during the Term, (a) negotiations leading to such a transaction commenced", D & A's Mot. at 34–35; ICT's

Mot. at 20, is clearly satisfied on the evidentiary record before the Court, and summary judgment is appropriately granted in favor of D & A on its counter-claim for $489,662.85 as a commission owed pursuant to the Idaho 5 and Tennessee 1 transaction.

## CONCLUSION

For the foregoing reasons, the Court Orders as follows:

1. Summary judgment is granted in favor of David Rhodes and Daniels & Associates, and against Independent Cellular Telephone, on all claims involved in C–93–0893 DLJ.

2. Summary judgment is granted in favor of Daniels & Associates, and against Independent Cellular Telephone, in the amount of $503,362.85 on the counter-claim involved in C–93–0893 DLJ.

3. The motions to dismiss submitted by Daniels & Associates are hereby granted. Actions C–94–0779 DLJ and C–94–0786 DLJ are hereby DISMISSED without leave to amend.

4. Daniels & Associates shall submit a proposed form of judgment with the Court on each of the actions described above by September 16, 1994. Independent Cellular Telephone, Templeton, Inc., and Saline Cellular, Inc. may submit a response to the proposed forms of judgment by September 30, 1994.

IT IS SO ORDERED.