CENTIGRAM ARGENTINA., S.A., an
Argentina corporation, Plaintiff,

v.

CENTIGRAM INCORPORATED,
a California corporation,
Defendant.

Centigram Communications Corpora-
tion, a Delaware corporation,
Counterclaim Plaintiff,

v.

Centigram Argentina, S.A., an Argenti-
na corporation, and Justo Milan,
Counterclaim Defendants.

No. C 98 21281 EAI.

United States District Court,
N.D. California,
San Jose Division.

Aug. 18, 1999.

E. Craig Moody, Richard P. Hill, Moody & Hill, San Francisco, CA, for plaintiff.

Bryan Wilson, Veronica Curet, Morrison & Foerster LLP, Palo Alto, CA, for defendant.

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

INFANTE, United States Magistrate Judge.

## I. INTRODUCTION

Presently before the Court is Defendant Centigram Communications Corporation's Motion for Summary Judgment, which came on for hearing on August 2, 1999. The parties appeared through their respective counsel of record. Having considered the papers submitted by the parties and the arguments of counsel at oral argument, and good cause appearing for the reasons set forth below, the Court denies in part and grants in part Defendant's motion.

## II. BACKGROUND

Defendant Centigram Communications ("Centigram") is a California corporation that provides voicemail equipment and services. Plaintiff Centigram Argentina ("CASA") is an Argentina corporation who was the exclusive distributor for Centigram's voicemail equipment and services in portions of South America, specifically Argentina, Paraguay and Uruguay. Plaintiff has sued Defendant for breach of contract and for business torts (intentional and negligent interference with existing and prospective economic advantage, and breach of the implied covenant of good faith and fair dealing). Defendant has now moved for summary judgment on all claims.

On March 10, 1994, the parties entered into a two-page Letter Agreement (Curet Declaration, Exh. A). No further formalized distributor contract was executed by the parties. Four years later, on April 14, 1998, Centigram gave notice to CASA of its intent to terminate the agreement, effective 90 days later, on July 15, 1998.

During the four-year relationship, several events occurred that are relevant to the present dispute. First, one of Centigram's existing customers was Movicom, an account that CASA began to service. Movicom became dissatisfied with the Centigram voicemail products because of technical difficulties that could not be resolved to Movicom's satisfaction, and ceased purchasing equipment or services from Centigram or CASA at least six months before Centigram terminated the distributorship. Movicom and CASA, however, were in discussions regarding a renewed service agreement when Movicom was informed that Centigram had terminated the distributorship agreement. No service agreement was finalized.

A second voicemail products and services customer in Argentina is Miniphone. Miniphone refused to deal with CASA or Centigram because CASA and Centigram provided equipment and services to Miniphone's competitor, Movicom. Centigram, however, sold PCM-manufactured equipment to Miniphone in Argentina through a distribution company called BSA. CASA contends that Centigram's sales through BSA to Miniphone violated the Letter Agreement which provided CASA with territorial exclusivity to distribute Centigram's products.

CASA contends that Centigram breached the Letter Agreement in two ways: first, by terminating the agreement, and second, by the sale of equipment to Miniphone through BSA. CASA also contends that Centigram's act of terminating the agreement and sales through BSA constituted intentional and negligent interference with existing and prospective economic advantage and breaches of the implied covenant of good faith and fair dealing.

Defendant now seeks summary judgment on all of Plaintiff's claims. Specifically, Defendant seeks summary judgment:

1) that it did not breach the exclusivity provision in the Letter Agreement by its sales of PCM equipment through BSA, or alternatively, even if it did, summary judgment is required because Plaintiff suffered no damages;

2) that it did not breach the Letter Agreement by giving notice of termination; and,

3) on each of Plaintiff's business tort claims, on the ground that Plaintiff has not offered evidence necessary to support each element of the claims, including damages.

## III. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Id.* 477 U.S. at 249–50, 106 S.Ct. at 2511.

Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Rule 56(c), F.R.Civ.P. A "material" fact is one which might affect the outcome of the case under the applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. *Id.* In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 477 U.S. at 255, 106 S.Ct. at 2513. Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.*

## IV. DISCUSSION

The Letter Agreement provides that the agreement should be governed and construed under the laws of the State of California, which the parties do not dispute. Letter Agreement, ¶ C.

 Under California law, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." *Morey v. Vannucci*, 64 Cal.App.4th 904, 912, 75 Cal. Rptr.2d 573, 578–79 (1998).

The California Civil Code sets forth numerous guidelines under which a contract must be interpreted. "A contract must be so interpreted as to give effect to the

mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636. When interpreting a contract, California courts begin their analysis with the language itself. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* at § 1638. "[T]he intention of the parties is to be ascertained from the writing alone, if possible ...." *Id.* at § 1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* at § 1641. "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." *Id.* at 1644.

■■■ Where, as here, the meaning of the words in a contract is disputed, "the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning." *Morey*, 75 Cal.Rptr.2d at 578. It is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. *Id.; Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging, Co.*, 69 Cal.2d 33, 40, n. 8, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). "If in light of the extrinsic evidence the court decides the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." *WYDA Assocs. v. Merner*, 42 Cal.App.4th 1702, 1710, 50 Cal. Rptr.2d 323 (1996). The Court's determination of whether an ambiguity exists is a question of law. *Id.*

■■■ Interpretation of the contract is an issue of law if a) the contract is not ambiguous, or b) the contract is ambiguous but no parol evidence is admitted or the parol evidence is not in conflict. *WYDA Assocs.*, 42 Cal.App.4th at 1710, 50 Cal. Rptr.2d 323; *Morey*, 75 Cal.Rptr.2d at 579. "Furthermore, '[w]hen two equally plausible interpretations of the language of a contract may be made ... parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory.'" *WYDA Assocs.*, 42 Cal.App.4th at 1710, 50 Cal. Rptr.2d 323 (quoting *Walter E. Heller Western, Inc. v. Tecrim Corp.*, 196 Cal. App.3d 149, 158, 241 Cal.Rptr. 677 (1987)).

### 1. *Breach of the Exclusivity Provision*

Defendant seeks summary judgment on Plaintiff's claim that Defendant breached the Letter Agreement by selling equipment in Argentina, an area in which Plaintiff had been granted exclusive distribution rights, through another distributor, BSA. The exclusivity clause is contained in Paragraph A(2)(h) of the Agreement, and provides that:

> Centigram Communications Corporation will distribute its products in Argentina, Paraguay and Uruguay through CASA, excluding sales through OEM relationships and third parties from outside the territory.

The parties do not dispute that Centigram purchased equipment from PCM, sold that equipment to BSA in Argentina for further sale to Miniphone, all without the participation of CASA.

CASA contends that Centigram thereby breached the exclusivity provision by offering to sell voice mail and related equipment in Argentina to Miniphone through BSA, rather than through CASA. Defendant contends that it did not breach the exclusivity provision, offering three theories:

> 1) there was no contractual exclusivity conferred on CASA because the parties never agreed to annual sales quo-

tas, which was a prerequisite to the grant of exclusivity;

2) the sales through BSA were expressly excluded from the grant of territorial exclusivity, because such sales were sales "through an OEM relationship," and

3) the sales did not violate the exclusivity clause because they were not sales of Centigram's equipment, but were instead, sales of PCM equipment.

Plaintiff disputes Defendant's characterization of the transactions, as well as Defendant's interpretation of the exclusivity clause.

### A. Defendant's Annual Sales Quotas Argument

Defendant's first argument is easily dismissed. Centigram contends that the distribution agreement was not exclusive—that the grant of exclusivity never attached—because the parties never agreed on the annual sales quotas. In support, Defendant cites to deposition testimony to the effect that witnesses do not recall any discussions regarding annual sales quotas. See Grindley Depo. 104:5–11; Millan Depo. 13:7–13; 16:11–17:7. Plaintiff argues, however, that the contract itself evidences an initial agreement on annual quotas, specifically $300,000 as set forth in ¶ A(2)(b). Moreover, Plaintiff offers declaration testimony to clarify the deposition testimony, to the effect that the witnesses were testifying that there were no further sales quota discussions other than those that occurred during the contract negotiations. Millan Decl. ¶¶ 10–11; Grindley Decl. ¶ 19.

■ Construing the evidence most favorably towards Plaintiff, a reasonable jury could find that the parties did at some point reach an agreement as to the annual sales quota and that therefore the distribution agreement became exclusive. Defendant's motion on this ground is therefore denied.

### B. Defendant's OEM Relationship Argument

Defendant's second argument in seeking summary judgment is that its sale of PCM-manufactured equipment through to Miniphone through BSA was exempted from the exclusivity clause because those sales constituted sales "through an OEM relationship" and are thus expressly excepted from the grant of exclusivity. Plaintiff contends that the parties only sought to exclude sales by third party OEMs, rather than sales by Centigram as an OEM.

Resolution of this question involves a matter of contract interpretation, specifically, that portion of Paragraph A(2)(h) which carves out an exception from the exclusivity for "sales through OEM relationships and third parties from outside the territory." The Court finds that the clause is ambiguous, and the phrase "through OEM relationships" is reasonably susceptible to either party's proffered interpretation. Thus, parol evidence should be considered to determine the true agreement of the parties. That evidence, however, appears to be in conflict.

Defendant offers two definitions of "OEM" from reference sources and argues that Centigram's sales as an OEM fall within the clause "sales through an OEM relationship." Curret Decl. Exhs. N and O. Plaintiff, by contrast, offers evidence of CASA's understanding of the phrase as illustrated by the parties' subsequent course of conduct, as evidenced by the Motorola transaction and CASA's contemporaneous response to it. Millan Decl. ¶ 12 and Exh. 7. CASA's evidence suggests that CASA understood the clause only to address a situation where Centigram sold products to another manufacturer, who embedded the Centigram products into other telecommunications products and which were subsequently sold, by the third party OEM, within the territory. Id.

■ A reasonable jury could agree with Plaintiff's interpretation. Thus, there is a

genuine issue of material fact regarding the meaning of the "sales through OEM relationships" clause and accordingly, there is a genuine issue of material fact regarding whether Centigram's sales to BSA violated the exclusivity provision. Summary judgment must therefore be denied. *WYDA Assocs.*, 42 Cal.App.4th at 1710, 50 Cal.Rptr.2d 323.

### C. *Defendant's Sales of non-Centigram Products Argument*

Defendant's third argument in seeking summary judgment on Plaintiff's claim for breach of the exclusivity clause is that the sales through BSA were sales of PCM-manufactured products, not sales of "Centigram's products," and therefore the sales were outside the scope of the distributorship agreement under which Centigram agreed to sell "its products" through CASA. Reply Brief at 8; Agreement ¶ A(2)(h).

Plaintiff again disagrees, and offers evidence in the form of declaration testimony that in the course of their four-year relationship, CASA had acted as a distribution arm for Centigram of products manufactured by others, but which were sold by Centigram. CASA argues that these PCM-manufactured products and other third-party-manufactured products were all offered through Centigram's catalogue and were therefore a part of Centigram's product line that CASA was to distribute in Argentina, Paraguay and Uruguay. Grindley Decl. ¶ 16 (Centigram's product line included products not of Centigram's own manufacture, but were to be sold by CASA because they related to the principal product, voice mail equipment); Millan Decl. ¶ 16 (Millan personally made presentations, bids and quotations to potential customers that included items manufactured by other manufacturers, including PCM; no one from Centigram at the time suggested that such products would fall within the OEM relationship exclusion); Marroquin Depo. 89:7–90:9 (PCM products were in Centigram brochures and were promoted in the name of Centigram). Moreover, Centigram put its own part

numbers and trademark, "Mobile Manager," on the products. Bridges Depo. 108:24–109:24.

CASA also offers additional evidence, specifically the Declaration of Justo Millan that

It was not until documents were produced by CCC [Centigram] in this litigation that I learned that CCC had sold the products that were bought by and installed in Miniphone. I also learned then that they were products that were CCC products, based upon products that they had acquired from PCM, with CCC names, product numbers and with CCC product literature. In fact they were the same products that I had initially presented to Miniphone with Ms. Marroquin. Prior to this litigation my understanding was that these sales that Ms. Marroquin had made had been made directly to Miniphone by PCM, whom Ms. Marroquin, I believe, also represented.

Millan Decl. ¶ 18.

■ There appears to be no dispute by the parties that Centigram is not the manufacturer of the PCM equipment which it sold to Miniphone through BSA. That does not end the inquiry, however, for the question remains whether the PCM products ultimately sold by Centigram to Miniphone constituted "Centigram's products" under the parties' Letter Agreement such that those sales through BSA violated the exclusivity clause. Reading all of these facts in a light most favorable to the non-moving party, a jury could reasonably conclude that those sales violated the exclusivity clause, and accordingly, summary judgment must be denied.

### 2. *Contract Damages Are Shown*

As an alternative, Defendant seeks summary judgment on CASA's claim for breach of the exclusivity clause on the ground that Plaintiff has not suffered any damages. Defendant points to evidence that establishes that Miniphone declined to do business with CASA or Centigram be-

cause those parties serviced Miniphone's competitor, Movicom. Thus, Centigram argues that even if its sales of PCM products through BSA to Miniphone are considered a breach of the exclusivity clause, there is no damage to CASA because CASA could not have made the sale to Miniphone anyway.

In opposition, Plaintiff argues that there is a genuine issue of material fact as to whether it could have made the sales to Miniphone. CASA does not deny that Miniphone refused to do business with it, but contends that since BSA is now serving both Miniphone and Movicom, with a "Chinese Wall" erected between the engineers and service people on the two accounts to prevent disclosure of confidential information, CASA could have done so just as easily, if given the opportunity. Specifically, Mr. Millan declares:

> If I had been told that CCC was going to go ahead and try to sell the PCM-manufactured equipment to Miniphone under its own name but needed to find a different local service provider, my shareholders and I could easily have set up a different company, without the CCC name. An, using a different engineer, we could have serviced the account with no commingling of information between him and the engineer who serviced the Movicom account, thus assuaging Miniphone's concerns. I was not given that opportunity. In fact, I did not know that CCC was directly involved in the sale of voice mail equipment to Miniphone through a different distributor, BSA, in a territory, Argentina, that was supposed to be exclusively ours under our contract with CCC.

Millan Decl. ¶ 20.

CASA further contends that under its commission structure, it would have earned $1,950,000 on the sales that were made through BSA. Grindley Decl. ¶ 32.

■ Defendant objects to the evidence offered by CASA on the ground that it constitutes speculation on hypothetical facts regarding what CASA and Miniphone might have done or could have done. Con-

clusory speculative testimony is insufficient to raise a genuine issue of material fact and defeat summary judgment. *Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir.1991) (rejecting speculative affidavit not based on personal knowledge), *aff'd* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993); *Independent Cellular Tel. v. Daniels & Assocs.*, 863 F.Supp. 1109, 1114 (N.D.Cal.1994).

■ Plaintiff's evidentiary showing, however, is sufficient to defeat summary judgment. First and foremost, the Court must construe the evidence most favorably towards Plaintiff. So construed, the evidence suggests that there is a business practice in Argentina, where Miniphone is located, under which competitors such as Miniphone and Movicom both contract for equipment and services from the same distributor, provided that certain precautions are taken to safeguard the competitors' confidential business information. Plaintiff should not be deprived of the opportunity to present to a jury its evidence that it could have stood in the shoes of BSA, and made the same sales of Centigram's PCM equipment to Miniphone, notwithstanding contemporaneously servicing Movicom. Furthermore, Plaintiff has offered sufficient evidence that it has suffered damages as a result of Centigram's sales through BSA, specifically, the amount of sales and service BSA provided to Miniphone. Accordingly, Defendant's motion on this ground is denied.

### 3. *Breach by Terminating the Letter Agreement*

Defendant Centigram also seeks summary judgment on CASA's breach of contract claim, to the extent the claim is based on a theory that Centigram breached the agreement by terminating it. Centigram contends that the Letter Agreement is silent as to its duration, and accordingly, under California law, the contract is terminable at the will of either party, on reasonable notice. *See* Cal. Comm.Code

§ 2309(2); *see also, Varni Bros. Corp. v. Wine World, Inc.*, 35 Cal.App.4th 880, 890, 41 Cal.Rptr.2d 740 (1995) (where there is no agreement that the distributorship agreement would last for an indefinite period, the contract was terminable at will after a reasonable time and upon reasonable notice); *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union*, 69 Cal.2d 713, 727–28, 73 Cal.Rptr. 213, 447 P.2d 325 (1968). Plaintiff, by contrast, contends that the agreement was intended to last until terminated, and the only grounds for termination are set forth in Paragraph K, permitting termination should the parties ever fail to agree upon annual quotas. Defendant, in turn, disagrees, arguing that Paragraph K is clear and unambiguous on its face, providing only for the termination of the exclusivity of the contract, and does not address the termination of the agreement itself.

Thus, it is necessary for the Court to consider the Letter Agreement, under the principals of contract interpretation set forth above, to determine 1) whether Paragraph K is susceptible to the meaning advocated by Plaintiff, and 2) if not, whether the agreement is silent regarding its duration.

Paragraph K, in full, provides that:

Exclusivity in the territory is subject to termination within sixty (60) days of notification in writing by either party if agreements [sic] is not reached on the annual sales quota.

The language of Paragraph K—"exclusivity in the territory is subject to termination"—taken alone, appears clear and unambiguous. It relates only to a termination of the exclusivity granted under the contract, should the parties fail to reach agreement on annual sales quotas. Provisions in a contract, however, are not to be considered in a vacuum, but instead the entirety of the contract must be interpreted together. Cal.Civ.Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

In construing Paragraph K in light of the entire agreement, a jury could reasonably find that terminating exclusivity meant terminating the entire agreement. The contract provides that "the parties intend to cooperatively offer VoiceMail and related equipment in Argentina, Paraguay and Uruguay." ¶ A. The parties agree to "form CASA in good faith both legally and promptly to offer such services .…" ¶ A(1). The parties contemplate that developing a "mutually agreed upon business plan" including efforts to include "the mutually agreed upon exploration of the market for VoiceMail." ¶ A(2). Among other things, CASA specifically agreed to develop a one-year business plan "based upon discreet calibrations of revenues from specific customer types," agreed to an annual equipment sales quota of $300,000, subject to annual modification on mutually agreed terms, agreed to develop a competitive survey of the territory and to identify product requirements and specifications required in the three countries in the territory. ¶ A(1)(a)-(d). The parties agreed to "use the best reasonable efforts to cooperatively exploit the markets for VoiceMail services in Argentina, Paraguay and Uruguay." ¶ B. The parties also agreed that "Centigram Communications Corporation will distribute its product in Argentina, Paraguay and Uruguay through CASA, excluding sales through OEM relationships and third parties from outside the territory." ¶ A(2)(h). Finally, the contract provides that "Exclusivity in the territory is subject to termination within sixty (60) days of notification in writing by either party if agreements (sic) is not reached on the annual sales quota." ¶ K.

Construing the contract as a whole, it is clear that "exclusivity"—being the exclusive distribution means for sales of Centigram voicemail products and services— was the very essence of the contract, the primary consideration for which CASA bargained. An agreement to work cooperatively to develop and exploit a market for Centigram's products and services, absent territorial exclusivity, would appear to be

absurd. Thus, a provision terminating "exclusivity" could be understood to be a provision governing termination of the contract itself. Thus, the contract is not silent on the grounds for termination.

Defendant relies on several cases to assert that the law may imply into a contract a right of either party to terminate the agreement at will, upon reasonable notice, and after the agreement has been in place for a reasonable time. *Varni Bros.*, 35 Cal.App.4th 880, 41 Cal.Rptr.2d 740; *Consolidated Theatres*, 69 Cal.2d 713, 73 Cal.Rptr. 213, 447 P.2d 325. Defendant's authorities, however, are distinguishable, because in each of those cases, the agreement at issue was wholly silent on termination. Specifically, *Varni* involved a contract that was implied in fact by the parties actions, one which was entirely silent of express provisions, either written or oral. Similarly, although *Consolidated Theatres* involved a written contract, its duration and termination were left unstated. Under such circumstances, the law will imply into the agreement, a right to terminate at will, on reasonable notice, after a reasonable time, as described above. In the present situation, by contrast, the contract is not silent on termination—the parties negotiated an express clause addressing termination, albeit in the form of addressing "termination of exclusivity." Since the parties have expressly addressed and negotiated "termination," the Court will not imply other grounds for terminating the entire agreement.

Defendant also cites cases for the proposition that "a contract will not be construed to call for perpetual performance unless the language of the contract unequivocally compels such construction." *Zimco Restaurants, Inc. v. Bartenders & Culinary Workers Union*, 165 Cal.App.2d 235, 238, 331 P.2d 789 (1958); *Nissen v. Stovall–Wilcoxson Co.*, 120 Cal.App.2d 316, 319, 261 P.2d 10 (1953). Once again, Defen-

dant's authorities, while supporting the proposition for which they are asserted, are not on point. The Letter Agreement between Centigram and CASA does not require perpetual performance: either party may cause the agreement to terminate by not agreeing to the annual sales quota.[1]

■ The Court finds that there is a genuine issue of material fact regarding whether Centigram had the right to terminate the agreement at will, absent a disagreement on the annual sales quotas. The evidence is in conflict, and reading the evidence most favorably towards CASA, a reasonable jury could conclude that the parties intended that the only grounds for terminating the parties' contract was if the parties ever failed to reach agreement on the annual sales quota. Under that reading, Centigram's termination in April of 1998 would constitute a breach of the Letter Agreement.

### 4. *Summary Judgment on The Business Tort Claims*

Plaintiff has asserted three business tort claims: intentional interference with existing and prospective economic advantage, negligent interference with existing and prospective economic advantage, and breach of the implied covenant of good faith and fair dealing. Defendant seeks summary judgment on each claim.

#### a. *Intentional and Negligent Interference Claims*

CASA claim's that Centigram intentionally interfered with CASA's existing and prospective business advantage by falsely telling Movicom that as of April 14, 1998 [the date Centigram gave notice of termination], BSA was Centigram's only distributor in Argentina, when the termination was not to be effective until July. CASA also contends that the same false statement was made to other commercial enter-

---

**1.** The Court does not reach the question of whether other grounds for termination may be implied in the contract, such as a party's right to terminate for the other party's failure to perform.

prises with which CASA had developed advantageous economic relationships.

 For Plaintiff to prevail on its claim of intentional interference with existing and prospective economic advantage, CASA must prove: 1) an economic relationship existed between CASA and some third party, with the probability of future economic benefit to CASA, 2) Centigram's knowledge of that relationship between CASA and the third party; 3) intentional acts by Centigram designed to disrupt that relationship, 4) actual disruption of the relationship, and 5) damages to CASA proximately caused by Centigram's acts. *Silicon Knights, Inc. v. Crystal Dynamics, Inc.,* 983 F.Supp. 1303, 1311 (N.D.Cal. 1997); *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.,* 42 Cal.App.4th 507, 521–22, 49 Cal.Rptr.2d 793, 803 (1996). CASA must also prove not only that Centigram knowingly interfered with CASA's expectancy, but also that Centigram engaged in conduct that was wrongful by some legal measure other than the fact of the interference itself. *Silicon Knights,* 983 F.Supp. at 1311, citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 392–93, 45 Cal.Rptr.2d 436, 447, 902 P.2d 740 (1995).

 Defendant contends that CASA cannot produce any evidence to support the elements of its cause of action. Having considered the evidence submitted by the parties, however, the Court disagrees. Read most favorably to the Plaintiff, there is evidence sufficient to defeat summary judgment. First, there is evidence of an economic relationship existed between CASA and Movicom, and the possibility of an economic relationship with Miniphone, both with the probability of future economic benefit to CASA. Second, there is evidence to suggest that Centigram knew of CASA's relationship with Movicom, and that Centigram knew of the opportunity at Miniphone. Third, there is evidence that Centigram acted intentionally to terminate the agreement, thereby disrupting the potential stream of service agreement revenue, and also acted intentionally to take advantage of the Miniphone business without including CASA. Fourth, there is evidence that the service agreement negotiations with Movicom terminated, and also that Miniphone accepted the business from BSA and not CASA. Finally, there is evidence that CASA suffered damages proximately caused by Centigram's acts. Accordingly, summary judgment must be denied.

b. *Breach of Covenant of Good Faith and Fair Dealing*

Finally, Defendant seeks summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing on two grounds: 1) that such claim requires an underlying breach of the Agreement which is absent here; and 2) CASA cannot recover tort damages under this claim, and since it has failed to establish any recoverable contract damages, Defendant is entitled to summary judgment.

 As to the first ground, establishing that there has been a breach of contract is a prerequisite to obtaining recovery under the theory of breach of the implied covenant of good faith and fair dealing. *Bionghi v. Metropolitan Water Dist. of Southern Cal.,* 70 Cal.App.4th 1358, 1370, 83 Cal.Rptr.2d 388 (1999)(affirming summary judgment on claim for breach of the implied covenant arising out of the termination of a contract when there was no breach of the contract by the termination). Centigram's primary argument fails, however, because as discussed above, there are genuine issues of material fact in dispute regarding whether Centigram breached the Letter Agreement.

 Defendant's second ground for seeking summary judgment on the breach of the implied covenant, however, stands on stronger grounds. Specifically, Defendant argues that CASA cannot recover tort damages under the claim for breach of the implied covenant of good faith and fair dealing, because "tort recovery for breach of the covenant is available only in limited

circumstances, generally involving a special relationship between the contracting parties, such as between an insured and its insurer." *Id.* A supplier-distributor relationship is not a "special relationship" that could give rise to tort recovery. *Premier Wine & Spirits of S.D. v. E. & J. Gallo Winery,* 644 F.Supp. 1431, 1436–37 (E.D.Cal.1986), *aff'd* 846 F.2d 537 (9th Cir. 1988). Plaintiff has not established that the Centigram–CASA relationship was a "special relationship" such that tort damages may be recovered and thus has failed to carry its burden in opposing Defendant's motion. Accordingly, Defendant is entitled to preclude tort damages on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, and its motion, to this degree, is granted.

## V. CONCLUSION

For the foregoing reasons, and GOOD CAUSE APPEARING, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is DENIED in part and GRANTED in part.

IT IS SO ORDERED.